## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **RICKY LEON FARMER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 13-1359-KHV** |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Ricky Leon Farmer appeals the final decision of the Commissioner of Social Security to deny

disability insurance benefits and supplemental security income (SSI) under Titles II and XVI of the

Social Security Act, 42 U.S.C. §§ 401-434, 1281-1385.  For reasons set forth below, the Court finds

that the final decision of the Commissioner should be affirmed.

## I.      Procedural Background

Plaintiff was born in 1964.  On August 19, 2009, plaintiff applied for disability insurance

benefits under Title II and for SSI under Title XVI alleging a period of disability beginning October

1, 2003.  Tr. 119-25, 126-33.  The agency denied plaintiff's application initially and upon

reconsideration.  On January 25, 2012, following a hearing, an administrative law judge ("ALJ")

found that plaintiff was not disabled as defined in the Social Security Act. Tr. 22.  On July 26, 2013,

the Appeals Council denied plaintiff's request for review. Tr. 1-3.  The ALJ decision thus stands

as the final decision of the Commissioner.  See U.S.C. §§ 405(g), (h).  Plaintiff appealed the final

decision of the Commissioner to this Court.

## II.   Facts

The following is a brief summary of the evidence presented to the ALJ.

### A.   Medical Evidence

Duodenal Ulcer

From October 10 through 12, 2003, plaintiff received inpatient treatment at Integris Bass Baptist Health Center for a duodenal ulcer.  He was re-admitted for inpatient care from October 13 through October 18, 2003.  Since then he has suffered occasional flare-ups of the ulcer.

Mental Health Treatment

On July 11, 2009, plaintiff sought psychiatric and drug counseling at the Mental Health Center of East Central Kansas ("Mental Health Center").  Tr. 301. He reported that his drugs of choice were marijuana and alcohol, which he had last used two weeks earlier.  Tr. 302.

On October 20, 2009, plaintiff looked tired and had a scattered thought process and depressed mood and affect. Tr. 413.  For the next several months, treatment providers at the Mental Health Center recorded normal findings, except for  depressed mood and tired affect on January 5, 2010. Tr. 404, 407, 409, 411.  His treating mental health nurse practitioner prescribed Seroquel and Lexapro to treat his depression and other mental health issues.

On June 15, 2010, Philip Rosenshield, Ph.D., a state agency psychologist, opined that plaintiff's psychological impairment was not severe.  Tr. 376.  On December 22, 2010, Sallye Wilkinson, Ph.D., affirmed Dr. Rosenshield's opinion.  Tr. 428.

On July 29, 2010, plaintiff returned to the Mental Health Center, exhibiting a depressed mood and flat affect. Tr. 402. On August 5, 2010, his treating nurse practitioner prescribed Abilify.

Two weeks later, he reported that Abilify was not working and that it made him more irritated and upset. Tr. 401.

On March 29, 2011, the Mental Health Center treatment notes indicate that plaintiff was unkempt and displayed a depressed mood. Tr. 552. On July 19, 2011, the Mental Health Center discharged plaintiff because he had stopped going to appointments. Tr. 551.

Spine And Related Physical Conditions

On May 2, 2010, plaintiff injured himself while lifting a truck battery. On May 3, 2010, Jeff Sloyer, M.D., examined plaintiff and observed tenderness between his shoulder blades, a positive ulnar compression test and a positive Tinel sign.[1] Tr. 421. On May 8, 2010, an MRI of plaintiff's cervical spine revealed severe degenerative disc disease between C5 and C6 and between C6 and C7 with some displacement of the cervical cord. Tr. 353. The radiologist recommended referral to a neurosurgeon. Tr. 353.

On June 1, 2010, Dr. Sloyer examined plaintiff and found that he had pain with range of motion, tenderness to palpation and spastic muscle bundles. He prescribed Prednisone and commented that plaintiff "is in the process of getting disability which I think it is a good plan since he is not employable at this time." Tr. 420.

On June 14, 2010, Anthony Eidelman, M.D., a pain management specialist, examined plaintiff. He found that plaintiff had slightly reduced range of motion of his neck, reduced grip strength and decreased sensation in plaintiff's hands. Tr. 356-57. He diagnosed chronic pain,

---

[1]     A positive Tinel sign means that the patient experiences worsening in tingling of the fingers when the examiner taps the median nerve in the wrist. A positive Tinel sign is an indicator of carpal tunnel syndrome or other nerve conditions. Carpal Tunnel Syndrome, http://www.orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.html (last visited Apr. 28, 2015).

cervical degenerative disc disease, cervical radiculopathy and cervical stenosis.  Tr. 357.  He administered an epidural steroid injection.  Tr. 357.  On July 12, 2010, Dr. Eidelman gave plaintiff a second injection.  Tr. 397.

On July 9, 2010, Marcia Foster, M.D., a State agency physician, opined that plaintiff could perform light work with no overhead reaching.

On August 9, 2010, Dr. Sloyer reported improved range of motion and pain control with Gabapentin.  Tr. 419.  On August 25, 2010,  Dr. Sloyer prescribed Maxalt, Demerol and Phenergan to help alleviate a migraine.  Tr. 418.  On September 10, 2010, plaintiff reported that his upper back pain was not controlled.  Tr. 432.  Dr. Sloyer found pain with range of motion, increased the dose of Gabapentin and referred plaintiff to a neurosurgeon.  Tr. 432.

On December 7, 2010, an MRI of plaintiff's cervical spine revealed significant cervical degenerative disc disease and foraminal stenosis at C5 through C7.  Tr. 426.  On January 17, 2011, Matthew Wills, M.D., a neurosurgeon, examined plaintiff.  Tr. 439-440.  Dr. Wills noted diminished upper extremity strength, diminished lower extremity sensation and reduced reflexes.  Tr. 440.  Dr. Wills recommended a three-level cervical fusion.  Tr. 440.

On February 5, 2011, Lucas Schnell, M.D., a consultative physician, examined plaintiff and observed reduced range of motion and diminished grip strength bilaterally.  Tr. 450.

On February 9, 2011, plaintiff had cervical fusion surgery.  Tr. 497.  Dr. Wills instructed plaintiff to wear a cervical collar at all times when out of bed.  Tr. 534.  Two weeks after the surgery, Dr. Wills noted that plaintiff continued to have numbness in his right arm.  Tr. 468.

On March 4, 2011, plaintiff fell and went to Stormont-Vail Hospital for treatment.  Tr. 471.  An examination revealed weakness in the arms and hands.  Tr. 472.  A CT scan of the cervical spine

showed osteophytes between C3 and C6 in addition to foramina narrowing at C5 through C7.  Tr. 473.

On April 8, 2011, Dr. Wills removed the cervical collar and directed plaintiff not to work for three months and referred him to physical therapy.  Tr. 504-03.  On April 19, 2011, an x-ray of plaintiff's hands revealed mild degenerative joint disease.  Tr. 600.

On May 4, 2011, Carol Eades, M.D., a state agency physician, opined that plaintiff should be capable of a range of light work with no overhead reaching or depth perception within 12 months of his surgery.  Tr. 508-15.

On May 10, 2011, Dr. Sloyer examined plaintiff to evaluate hand pain and numbness.  Tr. 584.  Dr. Sloyer noted positive Tinel and Phalen signs[2] bilaterally and prescribed wrist splints.  Tr. 584.  On June 17, 2011, Dr. Sloyer prescribed Gabapentin for lower extremity neuropathy, and suggested that plaintiff wait "to see how his disability or medical card turns out" before pursuing more aggressive treatment.  Tr. 583.  On September 14, 2011, Dr. Sloyer observed reduced range of motion, stiffness and pain to touch.  He prescribed Hydrocodone and Neurontin for pain.  Tr. 580.

On December 9, 2011, Dr. Sloyer noted that Dr. Wills recommended injections for plaintiff's pain but that plaintiff was not insured.  Tr. 579.  Dr. Sloyer examined plaintiff and found that he exhibited decreased range of motion.  Specifically, plaintiff could move his neck only 30 to 40 per cent to either side, adduction was more limited and grip strength was weak in the right hand.

---

[2]       Phalen's maneuver is done by pushing the back of the hands together for one minute. This compresses the carpal tunnel to produce carpel tunnel syndrome symptoms.  If the symptoms worsen when the maneuver is performed, it indicates a positive Phalen's sign.  A positive Phalen's sign may indicate carpal tunnel syndrome.  The test is only indicative, however, and does not definitively identify the syndrome.  Carpal Tunnel Syndrome, supra note 1.

Plaintiff exhibited radicular symptoms.  Tr. 579.  Dr. Sloyer opined that plaintiff met Listing 1.04.

Dr. Sloyer indicated that plaintiff's condition would require him to walk away from a work station

every 15 minutes and that he would miss more than four days of work a month.  Tr. 537-540, 546.

On March 24, 2012, a CT scan of plaintiff's cervical spine revealed stable post-surgical

changes.  Tr. 637.

On September 5, 2012, Dr. Sloyer stated that plaintiff's had degenerative disc disease with

stenosis that caused numbness and pain in both arms.  Dr. Sloyer suggested that plaintiff's condition

prevented competitive employment.  Tr. 624.

On November 30, 2012, an MRI of plaintiff's cervical spine revealed a solid fusion with a

bulge at C3-C4. Tr. 635.

Vision

In February of 2010, Dr. Alan Cornett, a consultative examiner, noted that plaintiff was blind

in the left eye and had 20/200 vision in the right eye.  On April 29, 2010, Dr. Michael Reynolds,

another consultative examiner, found that plaintiff had 20/400 vision in the left eye and 20/60

corrected vision in the right.  Tr. 345.  Dr. Reynolds prescribed corrective glasses.

**B.      Plaintiff's Testimony**

At the administrative hearing on January 13, 2012, plaintiff testified as follows.

Plaintiff is divorced and lives with his girlfriend.  He does not drive, and when it is cold he

does not get out much.  He visits his parents who live next door.  Tr. 34.  Plaintiff spends his free

time watching television.[3]

---

[3]      Plaintiff used to build models but can no longer do so and reports that he has no other
hobbies.

In January of 2010, plaintiff had surgery to repair bulging disks. Tr. 45, 47. The surgery did not help, and he is in pain every day.

Plaintiff has pain in his neck and shoulders which is worse when he picks things up or tries to do chores such as vacuuming. Dr. Sloyer prescribed pain medication and plaintiff received some injections until sometime in 2011, when his medical card expired. Tr. 36. Plaintiff currently addresses the pain by moving stretching and taking Aleve, which "takes the edge off."[4] Tr. 38. He lays down for about half of each day due to pain. The pain radiates to his lower back and arms, and has gotten worse since he stopped receiving treatment.

Plaintiff can shower and dress independently except that he needs help with buttons. He does some household chores including washing dishes; he does not do laundry, grocery shopping or yard work.

Plaintiff can sit for about 15 minutes before he has to get up, and can stand for 15 to 20 minutes and walk about 30 feet before he has to rest. He can lift about ten pounds comfortably. After doing something around the house for 20 or 30 minutes he has to take a break for 15 or 20 minutes. Tr. 39-42. During a full work day he would need to rest at least ten times. Tr. 42.

Plaintiff has trouble with vision and usually wears glasses, which sometimes give him headaches. His left eye "is pretty well gone."[5] Tr. 37. Plaintiff can watch television using his right eye and can read a newspaper or grocery list by holding it up close or using a magnifying glass. Tr. 36-37.

---

[4]     Plaintiff rates his pain as five on a scale of one to ten when he does not take Aleve and four when he takes Aleve.

[5]     Dr. Reynolds thought that glasses would improve the vision in his left eye, but they did not.

Plaintiff received treatment for depression and took prescription medication for it in the past. Currently he cannot afford the medication. Tr. 42-43. Until about a year ago, plaintiff used alcohol, marijuana and methamphetamine. He has been sober for a year and goes to AA meetings online.

Plaintiff has a ninth grade education and some on-the-job training in welding. Tr. 43-45. His last job was working with plastics in 2006; he started having trouble with his ulcers and his employer laid him off.

### C.      Vocational Expert Testimony

The ALJ asked the vocational expert whether an individual limited to light work, frequent bilateral reaching, no depth perception and no exposure to vibrations could perform work. Tr. 50-51. The vocational expert testified that someone with those restrictions could work as a marker/delivery clerk, routing clerk and night cleaner. Tr. 51. The vocational expert testified that an individual limited to no more than occasional rotation and flexion of the neck would not be able to maintain competitive work because he or she would be off-task over 15 per cent of the time. The vocational expert testified that an individual who needed to take breaks beyond the normally scheduled breaks would not be able to maintain competitive work. Tr. 50.

### III.    ALJ Findings

In his order of January 25, 2012, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2031.

2. The claimant has not engaged in substantial gainful activity since October 1, 2003, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: status post cervical spinal fusion and left eye amblyopia (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant can lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently. He can stand and walk for a total of six hours in an eight-hour workday and sit for up to six hours in an eight-hour workday. The claimant can frequently climb ramps and stairs, and frequently kneel, stoop, crouch, balance, or crawl, but only occasionally climb ladders, ropes or scaffolds. Furthermore, the claimant is limited to frequent, bilateral, overhead reaching and should avoid concentrated exposure to vibrations. Moreover, the claimant would be limited to jobs that do not require depth perception.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 8, 1964 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

\* \* \*

The vocational expert testified that given all of [plaintiff's limitations, he] would be able to perform the requirements of representative occupations such as Marker/Delivery Clerk, Routing Clerk, and Night Cleaner.

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 11-22 (some internal citations omitted).

IV.   **Standard Of Review**

The Court reviews the Commissioner's decision to determine whether it is "free from legal error and supported by substantial evidence." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009); see 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Wall, 561 F.3d at 1052; Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  It requires "more than a scintilla, but less than a preponderance." Wall, 561 F.3d at 1052; Lax, 489 F.3d at 1084.   Whether the Commissioner's decision is supported by substantial evidence is based on the record taken as a whole. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994).  Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion." Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005).  To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will meticulously examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

V.   **Analysis**

Plaintiff bears the burden of proving disability under the Social Security Act. Wall, 561 F.3d at 1062.  Plaintiff is under a disability if he can establish that he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least 12 months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844

F.2d 748, 750 (10th Cir. 1988)).  In the first three steps, the Commissioner determines (1) whether claimant has engaged in substantial gainful activity since the alleged onset, (2) whether he has a severe impairment or combination of impairments and (3) whether the severity of any impairment is equivalent to one of the listed impairments that are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(c), (d); see Williams, 844 F.2d at 750-51.  If claimant satisfies steps one, two and three, he will automatically be found disabled.  If claimant satisfies steps one and two but not three, the analysis proceeds to step four.

At step four, the ALJ makes specific findings of fact at three phases: (1) the individual's RFC, (2) the physical and mental demands of prior jobs or occupations and (3) the ability of the individual to return to the past occupation given his or her RFC.  Winfrey v. Chater, 92 F.3d 1017, 1023-25 (10th Cir. 1996).  If the claimant satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy.  Jensen v. Barnhart, 436 F.3d 1163, 1168 (10th Cir. 2005); see 20 C.F.R. § 404.1520(a)(5).

Plaintiff claims that the ALJ erred in (1) weighing the medical opinions and evaluating his credibility to formulate his RFC and (2) in finding that he could perform work that exists in the national economy.

### A.    Evaluation Of Medical Opinions

Plaintiff claims that the ALJ did not properly weigh the treating physician's opinion and placed too much weight on the opinion of non-examining medical sources.  He asserts that as a result, the ALJ ignored his limited range of motion in his neck and erroneously formulated an RFC which allowed for occasional cervical rotation and flexion.

"Medical opinions are statements from physicians and psychologists or other acceptable

medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis."   20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  If the Commissioner finds that a treating source opinion on the nature and severity of the claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the Commissioner will give it controlling weight.  See 20 C.F.R. §§ 404.1527(c)(2).  If the opinion is well supported, the ALJ must confirm that the opinion is consistent with other "substantial evidence" in the record.  Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003).  "If the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  Id.

Where, as here, the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must decide what weight to assign it.  Newbold v. Colvin, 718 F.3d 1257, 1265 (10th Cir. 2013).  Even if an opinion is not entitled to controlling weight, the ALJ must still weigh the opinion in light of the factors set forth at 20 C.F.R. § 404.1527.  Id.  Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ attention which tend to support or contradict the opinion.  Watkins, 350 F.3d at 1301; 20 C.F.R. §§ 404.1527(d)(2-6), 416.927(c)(2-6).

After considering the factors, the ALJ must give reasons for the weight which he gives the treating source opinion.  Watkins, 350 F.3d at 1301.  Finally, if the ALJ rejects the opinion

completely, the ALJ must then give "specific, legitimate reasons" for doing so.  Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996) (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

### 1.    Dr. Sloyer

The parties agree that Dr. Sloyer was a treating physician.  Plaintiff asserts that the ALJ improperly gave little weight to Dr. Sloyer's opinion that plaintiff continued to have problems with his neck pain "to the point where he is really unemployable."  Tr. 579 (examination in December of 2011).  Dr. Sloyer noted that while cervical fusion helped, plaintiff continued to have nerve pain into his right hand.  Tr. 579.  Dr. Sloyer opined that plaintiff met Listing 1.04 for cervical spine disorder and could never look down (i.e. he lacked sustained flexion of the neck), turn his head right or left or look up.  Tr. 540.

The ALJ gave little weight to Dr. Sloyer's opinion, finding that it was unsupported by medical records, inconsistent with Dr. Sloyer's own objective findings and with evidence from other treating sources.[6]  Tr. 16, 536.  For example, the ALJ noted that on the same day that Dr. Sloyer opined that plaintiff could never look down, turn his head right or left or look up, his examination showed that plaintiff could rotate, flex and extend his neck 30 to 40 per cent.  Tr. 540, 579.  The ALJ also considered that Dr. Sloyer was a primary care doctor rather than an orthopedic specialist or a "highly qualified expert in Social Security disability evaluation."  Tr. 17.

Plaintiff contends that the ALJ overlooked other medical records that are consistent with

---

[6]       The ALJ found that plaintiff did not meet or equal the requirements of Listing 1.04 because plaintiff did not have evidence of nerve root compression in a neuro-anatomic distribution with motor, sensory or reflex loss, spinal arachnoiditis confirmed by operative note or pathology report or lumbar spinal stenosis resulting in pseudo claudication.  Tr. 16.

Dr. Sloyer's opinion. Specifically, plaintiff points to evidence that he had a weak grip and decreased range of motion. The ALJ acknowledged that this evidence supported limitations in the RFC, but found that it did not support Dr. Sloyer's opinion that plaintiff could *never* use his right extremity and could *never* move his neck. Tr. 538-40. Moreover, the ALJ correctly noted that both consultive exams revealed cervical and lumbar range of motion in the normal range. Here, the ALJ gave specific reasons for discrediting Dr. Sloyer's opinion, and the records supports these reasons. See White, 287 F.3d at 908. The ALJ was warranted in giving little weight to Dr. Sloyer's opinion.

### 2. Dr. Eades

Plaintiff next contends that the ALJ erred in affording great weight to the opinion of Dr. Eades, a non-treating and non-examining medical source who reviewed plaintiff's medical records.

The opinion of a non-treating source who only examined claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. Doyal v. Barnhart, 331 F.3d 758, 762-63 (10th Cir. 2003). Further, the opinions of non-examining sources generally are entitled to even less weight than the opinon of non-treating sources. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004). In a case such as this, where the opinion of a non-examining source is inconsistent with the opinon of the treating physician, the ALJ's task is to examine the non-examining physician's opinion to see if it outweighs the treating physicians report – not the other way around. Goatcher v, United States Dep't of HHS, 52 F.3d 288, 289-90 (10th Cir. 1995). The ALJ must then explain why he credited the non-examining source opinion over that of the treating source. The Court will not insist on a factor-by-factor analysis so long as the ALJ decision is sufficiently specific to make clear what weight he gave to the treating source and the reasons for that weight. Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (citing Watkins, 350 F.3d at 1300).

On May 3, 2011, Dr. Eades opined that plaintiff should be capable of a range of light work with no overhead reaching or depth perception within 12 months of surgery.  Tr. 508-15.  The ALJ stated that he gave great weight to that opinion because it "reflects the progressive recovery of the claimant, status post surgery, which is consistent with the objective record."  Tr. at 20, citing Ex. 37F; see Noble v. Callahan, 978 F. Supp. 980, 987 (D. Kan. 1997) (ALJ may also consider residual functional capacity forms completed by medical consultants); 20 C.F.R. § 404.1527(f)(2)).  Plaintiff notes that in contrast to the projections of Dr. Eades, physical examinations during the 18 months after surgery revealed positive Tinel and Phalen signs, continued weakness and radicular symptoms in both arms and continued pain.[7]  Here, the ALJ properly discounted Dr. Sloyer's opinion, and then stated that he gave great weight to Dr. Eades's opinion in part because it is consistent with the objective record.  Although the ALJ could have more thoroughly explained why he gave great weight to Dr. Eades' opinion, it becomes clear that the ALJ finding is supported by the evidence when the Court also considers the ALJ's detailed discussion of why he discounted Dr. Sloyer's opinion.       Plaintiff's argument – which relies on evidence that supports Dr. Sloyer's opinion or detracts from Dr. Eades' opinion – overlooks the standard of review.  The fact that the record contains evidence which supports a finding contrary to the ALJ determination does not establish error.  See Smith v. Colvin, No. 12-1378-JWL, 2014 WL 811489, at *4 (D. Kan. Mar. 3, 2014) (court may not displace agency choice between two fairly conflicting views).  Plaintiff has not shown that the ALJ erred in evaluating the medical opinions.

---

[7]       Plaintiff also points out that the ALJ rejected Dr. Sloyer's opinion in part because he is a general practitioner, but did not note that Dr. Eades is also a general practitioner.

### B.    Credibility

Plaintiff asserts that the ALJ failed to properly evaluate the credibility of his assertions of limitations caused by subjective complaints and did not give sufficient reasons for finding him not entirely credible.

An ALJ's credibility determinations are generally treated as binding on review.  Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990).  Credibility determinations are peculiarly the province of the finder of fact and will not be overturned when supported by substantial evidence.  Wilson v. Astrue, 602 F.3d 1136, 1144-46 (10th Cir. 2010).   Therefore, in reviewing the ALJ credibility determinations, the Court will usually defer to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994).

The Tenth Circuit has explained the analysis for considering subjective testimony regarding symptoms, as follows:

> A claimant's subjective allegation of pain is not sufficient in itself to establish disability.  Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain.  This court has stated: The framework for the proper analysis of Claimant's evidence of pain is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).   We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

Thompson v. Sullivan, 987 F.2d 1482, 1488 (1993) (dealing specifically with pain) (further citations and quotation omitted).

For evaluating symptoms at step three of the framework, courts have set out a non-exhaustive list of factors which include the following:

the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489); see

Luna, 834 F.2d at 165-66; see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The Commissioner has promulgated regulations suggesting additional, somewhat overlapping factors: daily activities; location, duration, frequency and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness and side effects of medications taken to relieve symptoms; treatment for symptoms; measures which plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

Here, the ALJ set out the Luna framework and found that plaintiff had a medically determinable impairment of post cervical spinal fusion that could reasonably be expected to cause pain and fatigue. See Tr. 14, 18. The ALJ then found that to the extent that they were inconsistent with the RFC assessment, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible. The ALJ found that plaintiff's allegations of pain and fatigue were inconsistent with objective medical evidence, including medical records which indicated that the spinal fusion was successful, the implants were in good position and plaintiff's strength was a five of five. The ALJ noted that although plaintiff stated that he cannot afford prescription pain medication, he showed no evidence that he had tried to obtain free or reduced cost medical care. Tr. 20.

Plaintiff also alleged disability due to vision problems, but the ALJ noted his testimony that

he watched television, read the newspaper and filled out his disability application.  Throughout the

analysis, the ALJ set out plaintiff's claims of specific limitations due to pain and vision problems,

and pointed to evidence that suggested that plaintiff's limitations were less severe than he claimed.

For example, plaintiff testified that he had to lie down for a good part of the day, but he did not show

this limitation at either consultive exam.  The Court finds no basis to discount the ALJ's credibility

determination.

### C.      RFC Assessment

The ALJ determined that plaintiff retained the following RFC:

[Plaintiff can] perform less than a full range of light work as defined in 20 CFR
404.1567(b) and 416.967(b).  Specifically, the claimant can lift, carry, push, and pull
twenty pounds occasionally and ten pounds frequently.  He can stand and walk for
a total of six hours in an eight-hour workday and sit for up to six hours in an
eight-hour workday.  The claimant can frequently climb ramps and stairs, and
frequently kneel, stoop, crouch, balance, or crawl, but only occasionally climb
ladders, ropes or scaffold.  Furthermore, the claimant is limited to frequent, bilateral,
overhead reaching and should avoid concentrated exposure to vibrations.  Moreover,
the claimant would be limited to jobs that do not require depth perception.

Tr. 17.  See White v. Barnhart, 287 F.3d 903, 906 n.2 (10th Cir. 2001) (citing 20 C.F.R. § 416.945).

(residual functional capacity consists of those activities that claimant can still perform on regular

and continuing basis despite physical limitations).

Plaintiff asserts that the ALJ erred by not limiting his RFC to occasional cervical rotation

and flexion.[8]  The Commissioner points out that none of the evidence which plaintiff cites supports

a restriction of occasional cervical rotation and flexion.  A limitation to "occasional" use equates

to being able to perform the activity "at least once up to one-third of an eight-hour workday."  See

---

[8]      Plaintiff notes that the vocational expert testified that an individual with that
limitation would not be able to maintain competitive employment.  Tr. 52-53.

-18-

Program Operating Manual (POMS) § DI 25001.001(49).  Although plaintiff showed a reduced range of motion in his neck or pain with movement, the record does not support a finding that plaintiff was unable to rotate or flex his neck for two-thirds of the workday.  Plaintiff has the burden to establish that limitations should be included in his RFC, and he has not met that burden.  Further, the ALJ addressed plaintiff's allegations of cervical limitations but noted that both of the consultative examinations revealed cervical and lumbar range of motions in the normal range.  Tr. 16, 340-42, 448-51.[9]

The ALJ reasonably found that Dr. Sloyer's opinion as to plaintiff's extreme limitations in cervical range of motion was entitled to little weight; therefore the ALJ was warranted in not including a limitation to occasional cervical rotation and flexion in plaintiff's RFC.

### D.    Step Five

After formulating plaintiff's RFC and concluding that plaintiff had no past relevant work, the ALJ recognized that the burden shifted to the government to show that plaintiff could perform other work that existed in significant numbers in the national economy.  Tr. 21-22.  See Saleem v. Chater, 86 F.3d 176, 178 (10th Cir. 1996).  The Commissioner may satisfy this burden through the testimony of a vocational expert.  See 20 C.F.R. §§ 404.1566(e); 416.966(e).  Such testimony, in the form of a response to a hypothetical question posed by the ALJ, constitutes substantial evidence supporting the Commissioner's decision.  The ALJ's hypothetical includes all of plaintiff's credible physical and mental impairments.

Here, based on plaintiff's limitations that are supported by the record, the ALJ posed a

---

[9]    At these examinations, plaintiff was able to get on and off the examination table, walk heel to toe, squat and rise from a seated position, and hop with only mild or no difficulty.  Tr. 16, 342, 450.

hypothetical question to the vocational expert.  The vocational expert testified that the hypothetical person could perform work in the unskilled light labor market  Tr. 21, 51.  She provided representative examples of occupations including marker/delivery clerk, routing clerk and night cleaner.  Tr. 21, 51.

As set out above, plaintiff argues that the ALJ erred in not limiting him to only occasional cervical rotation and flexion.  The vocational expert testified that an individual with that limitation would not be able to maintain competitive work because it would result in off-task behavior more than 15 per cent of the work day.  Tr. 52-53.  If the hypothetical limitations are not supported by the evidence, however, the ALJ may disregard the vocational expert's testimony in response to a hypothetical question.  See Tankersley v. Astrue, No. 06-7122, 245 Fed. App'x 830, 833-34, 2007 WL 2411711, at *3 (10th Cir. Aug. 27, 2007).  Here, the ALJ found that plaintiff was not limited to only occasional cervical rotation and flexion; therefore he properly disregarded the vocational expert testimony in response to a hypothetical question that contained those limitations.  The ALJ justifiably relied on the vocational expert's testimony as substantial evidence in finding plaintiff not disabled.   See 20 C.F.R. §§ 404.1566(e), 416.966(e).   As the vocational expert's testimony constitutes substantial evidence and is supported by the record as a whole, the ALJ met the Commissioner's burden of showing a significant number of jobs in the national economy that an individual with plaintiff's impairments, symptoms and limitations could perform.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C § 405(g) **AFFIRMING** the Commissioner's decision.

Dated this 29th day of April, 2015, at Kansas City, Kansas.

s/Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge